This time we'll hear Zamora v. Morphix. Good morning. I'm Paul Shoemaker, the lawyer for the appellant, Morphix Company, Ltd. Morphix is a small British company. It has four employees. It was founded by Mark Newman, who is its managing director. Morphix provides consulting services to help businesses operate more effectively. They call it business transformation. They provide consultants who help businesses become more efficient, productive, reduce costs, introduce new technology, and so forth. Now, Morphix's biggest client at the time period in issue and over the years has been British Petroleum. You may recall there was a disaster called Deepwater Horizon. One of British Petroleum's wells in the Gulf of Mexico exploded and oil leaked into the Gulf for a prolonged period of time. After that, BP created the BPWA, which was the British Petroleum Well Advisory Project. And this is where Morphix became involved. They hired numerous consultants, up to as many as seven at one time, from Morphix to help with their attempt to make their business operations in regard to safety and security of their facilities more effective. Now, the defendant, who originally was the plaintiff, but I will refer to her as the defendant, Melanie Zamora, was one of those consultants. She and Morphix, well, her company, MGZ Consulting and Morphix, entered into a consulting agreement in 2012. And then she embarked on working at BP. And fast forward, she left Morphix and she went to work for BP. Well, she did. I just want to mention one interim thing. There were three years there. There were three good years where she worked. BP was happy with her services. And Morphix made lots of money. Morphix, and she did also. They more or less, it's roughly a split. Each year they made approximately $500,000 to $600,000 in revenue. Morphix kept half and she got half. So she was making $250,000 a year. If they got $600,000 and she got half, how come she only got $250,000? Well, there's some other expenses. What am I missing? The math is, I'm doing the math roughly. Yes, Your Honor, I admit I'm doing it roughly. And I'm not giving you the exact figures, but the total paid to, yeah. Let's go to the chase. Sure. Your client got a $33,000 judgment against Ms. Zamora. And the question I have for you is, how does that $33,000 loss suffered by your client stem from the breach by Ms. Zamora? So let's assume that she had no business going to BP because BP, because she said she wouldn't, and BP was your client's client. But then she never went to work for them. And she left and she never, I don't see what your damages are. Well, there were two avenues of causation which we argued. One was she needed the income, she needed a job, she would have continued working, but for the fact that she got the job offer from BP. That's what caused her to suddenly say, I'm leaving, I'm doing no more work. She would have kept working for your client, and your client would have continued to make money off her expertise and services, and therefore you had a right to have her continue working for you. You certainly had a right to have her not go to BP, but I don't understand where you get the right to continue to have her working for you. That's not the argument. We're not arguing that we had the right. We're arguing that we lost the revenue we would have had that she, independently of her own volition, would have continued to work for us because she needed the income and she had nowhere else to go. Who was the revenue coming from, BP? Yes. BP, which had the right at any point in time to say, I'm not going to pay you? They did, but this is a forward-looking measure of damages. Customers can always leave. If your business is burned down, you can say, the arsonist can say, well, you have to prove your customers would have kept coming. Well, the jury can infer, all right, it would have continued. The existing business relationship was sound and would have continued. That's all we were arguing. Don't you need a witness from BP, essentially, to say, and a person in a position with the gravitas to make this statement, look, if she had remained with you guys, we would have continued to hire you. I don't see that anywhere in the record, and tell me where it is. There is nothing in the record about her specifically, but you're asking a question that doesn't apply to computation of damages. I've tried a lot of cases. If you're operating a fruit stand by the road and somebody runs it over with a truck and it's destroyed and you sue for lost profits, you don't have to bring in customers to say, oh, we would have kept buying his fruit if his stand had not been destroyed. You don't sue the bananas. You don't sue the grapes. No, you sue the person who violated your rights and destroyed your business or reduced your business. Actually, you didn't lose BP's business. You continued being a consultant for BP. You had 13 consultants with Ms. Zamora. She left, and you continued on with 12 consultants. Did you show that there are no other consultants in the world? Well, that was the other thing.  But that brings me to the other theory of damages, which is that she, by abruptly leaving and refusing to cooperate with transition, she eliminated Morphix's. Where was it in her contract that she had to help transition? It's in the section that requires her to protect Morphix's commercial interests. Oh. Which would clearly include assisting in making the transition. You think she had to work for nothing? No. He offered to pay her, but she had an obligation under the consulting agreement to provide services that would protect Morphix's commercial interests. She was an at-will employee. No, she was not an employee. She was an independent contractor through her consulting firm. Who somehow had an ongoing obligation to continue to provide services once she walked out the door. Yes. Can we get back? I think you were going to show me or tell us where in the contract she has that obligation arises. Our position is that it arises out of section 4.2. Let's get a page of the appendix. The consulting agreement. Please. Section 4.2. It's around A462. 462. It's the beginning. 4.2 is on the next page. In the performance of its duties here under, consultant shall act so as to safeguard the intellectual. You sent us to 462. Then to the next page, 463. Yes. Which subsection is it again? 4.2. 4.2. Okay. May I read it? Obviously you can. In the performance of its duties here under, consultant, that is Ms. Zamora, right? She conceded she was bound by this, yes. So as to safeguard the intellectual property, commercial, and contractual interests of Morphix. And she'll comply with all reasonable requests and directions of Morphix or its nominee. And when she left, she quit. She had the right to leave and to quit. She had the right to leave. And you had the right to compel her, if you pay her, I guess, to do transition work? Yes. Our position is that contractually under this proviso, she was required to protect Morphix's contractual interests. The consulting agreement did not end when she quit. The consulting agreement is an overarching agreement. It was in effect with respect to each of the work orders. And until one part or the other terminated, it continued in effect. It would govern additional work orders if there were any. If not, it did govern the general relationship between Morphix and Zamora. And it included that Zamora. $33,000 is the amount of damages as a result of the violation of Section 4.2? Yes. And if I may say a word. How do you measure it? If I may say a word on that. Mr. Newman testified that the firm's profits on her work in 2015 would have been $298,000. And that is what we sought in damages, which I thought was relatively conservative. We weren't saying this would have gone on forever. We were saying there's evidence. They continued using his consultants throughout 2015. She would have continued. Now, the jury only gave us $33,000. You didn't replace her? They did not accept. If a half a million dollars like low-hanging fruit on a tree, you would have appointed, you would have gotten another consultant on board and just picked it up? There was testimony by Mr. Newman that he was able to make transitions at earlier times when other consultants left. But she deprived him of that opportunity by leaving with no notice and then refusing to cooperate in a transition. And if I may just explain, I think the $33,000, if you do the math, that represents approximately six weeks out of the $298,000 he said was lost for one year. I believe the jury figured they would give us what a reasonable transition period would have been. There were no special interrogatories? Pardon me? There were no special interrogatories? No, no. There were no requests? No. There was just a finding that there was a breach and then an award of an amount. But Mr. Newman had testified about the process of replacing an existing consultant. This is at A338. And he said that it typically takes one to two months. And he testified that this had happened previously in the relationship with BP, but it could not happen. Essentially, your argument to the jury is she owed Amorphix a six-week notice before she left. Well, we did argue. I mean, six weeks, we weren't that specific. We argued there was an obligation. She had to give notice. There was an obligation either to give notice that would enable him to make a transition or to remain and cooperate after she quit to assist in a transition. For free? Not for free. He offered to pay her. He would pay her. We don't know what the terms are. He would pay her for that. She's a person who works. There has to be some terms on which this person is going to get compensated. Well, a comp — She has to know what her obligations are. Well, they're in that contract that she has to protect and safeguard the commercial and contractual interests of Amorphix. That's not very specific. It is not very specific, but I think it would clearly cover this type of thing, that if you are going to leave, you have an obligation to help Amorphix protect its contractual business relationship, commercial relationship with BP, and she did not do that. And the jury awarded a very modest amount, I believe, reflecting that's what her violation of that provision, as well as her violation of the non-compete by interviewing behind his back with BP and taking a job with them, that those — either one of those violations is what caused him to lose some — Amorphix to lose some of its profits it would have had. Were both those argued to the jury? Yes. The latter was argued to the jury. Excuse me? No, both — The latter was argued to the jury. Both were argued. Both were argued to the jury, the two theories, and on the theory of that she would not have left. That's why the trial court made up this fact that she had an offer from Chevron, because it was clear she would not have left. But if all of this turns on whether she would have left, which does seem to be a different argument than — On the — Where would it go? On the one theory. There's two theories. On the theory that she would not have left if she did not have the offer from BP. And the trial court said, no, no, she would have left because she had an offer from Chevron, but she didn't. And the trial court just pulled that out of a lawyer's question. She didn't have a firm offer from Chevron. She had no offer, firm or otherwise. She was talking to them, but she didn't have an offer. And, I mean, I asked her — it's right in the transcript. I said, did you have an offer from Chevron at that time? She says, I did not. So the other theory — The question was literally, did you have an offer from Chevron at that time? Yes. The answer was no. That doesn't mean that — Was I did not. She didn't expect to get an offer from Chevron. She might have. And, by the way, that's why I think the jury awarded us so little. I think they thought, well, maybe within six weeks she would have gotten an offer from somewhere else. And then it would not be tied to her. So the jury was free to speculate how long she would have — that she would have stayed. And speculated how long she would have stayed until they speculated how long it would take for her to get an offer from Chevron. And then figured how much money you would have made off her if she stayed on for between one and two months, even though she had no obligation to — Well, Your Honor is using the word speculate. I would use the word infer that they could infer she was actively looking. She was maybe close with Chevron. She would have gotten an offer relatively soon. And so we won't give them the full year. We'll give them something for what period is reasonable to assume it would have taken her to find a new job. You've reserved rebuttal, I think. Yes. Thank you. Yes, I did. Thank you. Good morning, Your Honors. May it please the Court. My name is Nicholas O'Kelly. I represent Melanie Zamora and her company, MGZ Consulting, which, for purposes of this case, were one and the same. This is one of those cases where, to put it as simply as I can, I think the jury got it wrong and the judge got it right. The facts are undisputed that Ms. Zamora was at all times an independent contractor. She worked for specific work orders, 12 in number, and made the decision to leave after completing the work in the last work order. There were no other work orders in the pipeline? No, sir. There were no other orders. Normally, Mr. Newman and Ms. Zamora — Where would we find in the record that she left when her work on that work — on her last work order was completed? It was in her testimony, but I — it would take me a while to find the precise transcript. But she had testified that she completed the work on that work order, number 12. And at that time, she did not have a subsequent work order, and that was confirmed by Mr. Newman, who said he had not given her a work order, number 13. So that was — It's in your brief. Yes, it is, Your Honor. I don't remember. Okay. It is in the brief, and if — I can try and find it, but given that I only have 10 minutes, let me proceed. Bottom line, she was an independent contractor. It was undisputed that she was free to decline future work orders. It was further undisputed by Mr. Newman. She was free to decline those work orders. She could go anywhere she wanted. What strikes me getting to the heart of this, as the Court has asked, was in December — or, sorry, in November of 2014, Ms. Zamora was contacted by Morphix's counsel and encouraged to take an offer from Chevron and to let them know no later than December 1st. That's Plaintiff's Exhibit Number 24, which says, We encourage you to take it and let us know by December 1st what you intend to do. That begs a huge question. If Morphix is encouraging Ms. Zamora to go ahead and take the job in Zevron, how can she possibly be expected to assist in the transition? The fact is, this is an afterthought. There's nowhere in that letter from Morphix's counsel telling Ms. Zamora — There's nothing inconsistent about taking an offer from Chevron and staying on a couple weeks in order to assist in a transition. I didn't hear the question. I'm sorry. There's nothing inconsistent about encouraging somebody to accept an offer from Chevron and hoping and expecting that they would stay on and assist in a transition. Before they leave, people don't just blow out the door. That's true. And there is evidence that she did volunteer to assist in the transition but did not hear back from Mr. Morphix, who made no offer to pay her or ever discussed any kind of compensation for any part-time transition she might do. The other thing that should be brought to the court's attention is the court pointed out in its ruling on the motions for directive verdict that the argument that Ms. Zamora, had she not accepted the position with BP, which was only a temporary offer that was revoked, she would have continued to work for Morphix through 2015. The court soundly rejected that speculation, and there is no evidence to support that. What Morphix did in its argument was jump from not getting the offer with BP to continuing to work for Morphix in 2015, even though Morphix conceded that this required several factors, Ms. Zamora's acceptance of the position, Mr. Newman's approval of the position, a description of the work that was going to be performed, the length of the work that was going to be performed, and finally, BP's approval of this work. None of those factors are there, which leaves us right back to where we were with a speculative verdict that has no relationship to the evidence, and I think the district court correctly set aside the verdict and said you can't speculate when there is real doubt as to any damages at all. If there is some kind of damage, then sure, there's room to sort of guesstimate what it would be, but this is not an inference here. This is a speculation by the jury. Probably, although I'm speculating now, they were a little offended that she looked for a position with BP, and there was a contractual provision that said you can't do that. The law in New York is very clear. You don't get your judgment based on a technical breach, which in this case was temporary. You have to show damages, and in this case, no such damages were shown, and it's a little bit odd. One of the factors that you just took us through a moment ago, isn't the sine qua non that there was no continuing work with BP? You could throw out everything else, but the fact is that the speculation, and I'm sure Mr. Shoemaker will address this on rebuttal, but the speculation is that anything would have continued with BP. That is the speculation. There's no guarantee it would have continued with BP at all. In fact, the evidence goes to the contrary, that BP was winding down its operations. They were bringing the work in-house. You combine that with the absence of a work order, the absence of any specific job, and no testimony whatsoever. It could have been resolved by a simple question. Ms. Zamora, if you didn't have the job with BP, isn't it fair to say you would have continued to work for Morphix on a part-time basis or any basis until you found another job? Never asked in the case, because the answer would have been no. It was never asked. She had every intention of leaving, and the court, in its ruling on the JNOV, pointed out the testimony by Mr. Newman who said, I knew she was going to leave. She'd been telling me this for a while. She was going to go. It didn't come as a surprise. This whole talk about a transition and the damages arising from that transition is not only speculation. It is also an afterthought. Your Honor, as I said in the very beginning, I think the jury made a mistake, and that's what Rule 50 is for, and the judge corrected it. And we would ask that the judgment stand. Thank you.  Thank you. Thank you, Your Honor. Thank you. Well, Mr. Newman testified with regard to the transition at page A109 of the appendix. His testimony was, it would have been Morphix's responsibility to pay her for additional work, and we did offer to pay her for the additional work. So Mr. O'Kelley misstated the record. There is testimony. They offered to pay her. Clearly you would have had a duty to pay her for the additional work. Yes, but he just said there was no offer. There was an offer. Mr. Newman begged her to help with the transition, and she refused. And Mr. Newman also testified that he had a conversation. She didn't complete Work Order 12, right? She completed the existing work order. Did they offer her another work order? Who? Your client. BP addressed work orders to Morphix, not to her. That's great. There was no further work order. Morphix could have offered a work order to any of its consultants. Did they offer a new work order to her? No, because she had made it clear she's leaving, and she's not doing any more work. She completed Work Order 12, and she never got 13. Yes, and our position is from the record, which I referred to at the beginning of my argument, there was a record of three years of continuous issuance of work orders. All the rest of Morphix's consultants continued to get work orders in 2015. This would have continued, except that she left abruptly, and BP said, well, we'll bring this in-house because you don't have anybody ready to step in. And at page A136, Mr. Newman testified that he spoke with BP, and they had already made a decision to assign the work that previously was assigned to Morphix to an in-house resource. There was no opportunity to make a transition to find a suitable replacement. Now, if the basis of your damages is that BP would have offered a work order 13 and Morphix would have assigned it to her and would have made profit from that, how does that relate to the $33,000 judgment that you got from the jury? The theory is what I described before, that they would have felt, well, yeah, but she was determined to leave. She would have found something else within some time of less than one year, which Morphix is asking for. We would say estimate six weeks and we'll give them a little bit of the year, but we won't give them the whole year because it's not clear that she would have stayed through the whole year. She was looking for other employment. That assumes that she would have accepted work order 13 and then left six weeks later. What good would that have done Morphix? That would have caused damage, wouldn't it? Well, that could have been a problem, but I don't think the jury was thinking about that. I think they were thinking, okay, you lost some revenue, but we don't believe that you lost a full year. Would the jury be free to speculate about that though? I believe they were free to make a reasonable inference. She had described her job search and how long would it take her to get into position. The scenario that Judge Jacobs posed to you, the jury was equally free to speculate about as well, right? All of these things are out there and we're just trying to imagine what they might have done. Yes, and they might have said, well, she would have finished one work order, but we'll compromise somebody and the jury says give her that amount, give them that amount, and somebody says give them nothing, and they split the difference. I don't really know how they reached it. I'm just saying that they gave us only a small part of the one-year damages we were asking for, and I believe it can be explained either that they felt a transition could have been made, even without her cooperation, within less than a year, and number two, she would have left anyway, found some other employment, even if within less than a year. One last point I want to make clear, the judge also misread the record or mischaracterized the record regarding the notification given to Mr. Newman. Ms. Zamora only told Mr. Newman November 21st, 2014. The last day she said, I finished my work, I'm out of here. He begged her to help with the transition. She refused. There was no notification prior to that. She may have expressed some dissatisfaction. Maybe she'd look for another job, but there was nothing specific where she said I'm leaving, and if you look at what the judge cites, she's citing questioning about that final conversation. There was not an advance notice, and I do want to reiterate the judge relied on testimony of this witness, Kelso, which she should absolutely not have been given any credibility. She did allow our theories to go to the jury, and I do not believe they are speculative. When you have lost profits, as some of the authorities state, there's always an element of surmise and conjecture, and they're projecting out, there's always compromise, it's not certain. She would have stayed two months, four months, we don't know, but the jury was entitled to make a reasonable assessment and inference of what the damages were. Thank you. Thank you both. We'll reserve decision. In the case of United States v. Barneys, we're taking that on submission. In the case of Adams v. the City of New York, that is taken on submission. That's the last case on calendar. Can I please adjourn court?